**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.** **Case No. 25-CR-70**

**MICHAEL J. KORNELY,**

**Defendant.**

---

# ORDER ON DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY

---

## 1. Background

On April 15, 2025, the government charged the defendant, Michael J. Kornely, in a three-count indictment with two counts of Transportation of Minors with Intent to Engage in Criminal Sexual Activity in violation of 18 U.S.C. § 2423(a) and one count of Use of a Computer to Attempt to Persuade/Induce/Entice a Minor to Engage in Criminal Sexual Activity in violation of 18 U.S.C. § 2422(b). (ECF No. 1.)

Count One concerns John Doe One ("B.D.") and Count Two concerns John Doe Two ("J.R."). The government alleges that Kornely sexually assaulted B.D. and J.R., both of whom worked for Kornely when they were teenagers, on separate trips to Chicago and in Kornely's home. (ECF No. 21, at 1-2.)

Count Three concerns an incident that allegedly occurred in March of 2024. The government alleges that Kornely engaged in conversations with a Manitowoc

County Sheriff's Office Detective who posed as a 15-year-old boy on Snapchat. (ECF No. 21, at 3.) Kornely and the detective conversed about sexual matters and made plans to meet in a parking lot. (ECF No. 21, at 3.) Investigators arrested Kornely at that meeting location. (ECF No. 21, at 3.)

In March of 2026, the government gave Kornely notice of its intent to call Lynn Cook as an expert witness. (ECF No. 38, at 1.) Cook has a master's degree in social work from the University of Wisconsin–Milwaukee. (ECF No. 38-1, at 7.) She has worked as a forensic interviewer since 2015. (ECF No. 38-1, at 6.) Cook has met with over one thousand victims of child sexual abuse over the course of her career. (ECF No. 38, at 7.) Additionally, she has worked as a Children's Justice Act Program and Policy Analyst at the Wisconsin Department of Justice's Office of Crime Victim Services since 2022. (ECF No. 38-1, at 6.) Before that, she worked as a Sensitive Crimes Victim Advocate for the Milwaukee County District Attorney's Office. (ECF No. 38-1, at 7.) Cook has a substantial number of publications, lectures, and presentations related to forensic interviewing and child sexual abuse. (ECF No. 38-1, at 9–17.) She has also attended many trainings on these topics. (ECF No. 38-1, at 17–31.) Cook has testified in several other proceedings either at trial or by deposition. (ECF. No. 38-1, at 2.)

The government intends to ask Cook to testify about "the grooming that precipitates, and the disclosure that follows, teenage sex abuse." (ECF No. 38, at 3.) In particular, Cook's proposed testimony will include discussion of the following subjects:

- "what 'grooming' is (to include its various stages)"
- "the dynamics of disclosure and why there might be a delay between a crime against a child/teenager and reporting of the same, including but not limited to the nature of memories regarding such abuse"
- "why male victims of child/teenage sexual abuse might have particular difficulty disclosing their abuse"
- "why a victim might make contemporaneous communications with their abuser that suggest the victim's behavior is 'voluntary,' when it is not"
- "how abusers can frequently appear normal and law-abiding to their family and community while engaging in their crimes"
- "how and why child/teenage sexual abusers use specific physical locations to engage in their abuse"
- "how and why child/teenage sexual abusers frequently follow similar predation patterns against multiple victims"
- "why victims of child/teenage sexual abuse might have difficulty recalling specific details associated with their abuse"
- "how and why child/teenage sexual abusers conceal their crimes"
- "the relative accuracy rates of child/teenage sexual abuse allegations"

(ECF No. 38-1, at 3–4.)

Kornely has moved the court to exclude Cook's testimony arguing that it is inadmissible under Federal Rule of Evidence 702. (ECF No. 34.) The court on September 10, 2026, held a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), at which Cook testified.

**2. Legal Standard**

Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), governs the admissibility of

expert testimony. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). When a party offers expert testimony, the district court acts as a gatekeeper, allowing such testimony only when it "rests on a reliable foundation and is relevant to the task at hand." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778 (7th Cir. 2017). The district court must determine (1) whether the witness is qualified, (2) whether the expert's methodology is reliable, and (3) whether the testimony will help the trier of fact to understand the evidence or determine a fact in issue. *Id.*

**3. Analysis**

**3.1. Qualifications**

To testify as an expert, a witness must be qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. When determining if an expert is qualified in a given area, a court should consider "an expert's full range of practical experience as well as academic or technical training." *United States v. Garcia Parra*, 402 F.3d 752, 759 (7th Cir. 2005). While academic expertise may be sufficient to qualify a witness as an expert, it is not necessary. *Id.* Indeed, the Advisory Committee notes to Rule 702 recognize that "experience is the predominant, if not the sole, basis for a great deal of reliable expert testimony" in some fields. *United States v. Conn*, 297 F.3d 548, 556 (7th Cir. 2002) (quoting Fed. R. Evid. 702, advisory committee's note to 2000 amendment).

The government intends to have Cook testify about the behavioral patterns of sexual abusers and victim disclosure and recall of child sexual abuse. Kornely argues that Cook is not qualified to testify about these matters, because they "are rooted in

scientific research, not in skill and training." (ECF No. 34, at 10.) To support this, Kornely points to the substantial amount of scientific literature concerning the nature of memories, victim disclosure of sexual victimization, and the behavioral patterns of sexual abusers. (ECF No. 34, at 10–13.) Since Cook is a forensic interviewer rather than a scientist, Kornely contends that she does not have the knowledge necessary to testify about these topics.

As noted above, scientific and academic study are not the exclusive means by which a witness may qualify as an expert. *See Garcia Parra*, 402 F.3d at 759. Expertise may also be based on experience or training. *Conn*, 297 F.3d at 556. Accordingly, the Seventh Circuit has often held that witnesses are qualified to testify as experts because of their experience. *See e.g. Garcia Parra*, 402 F.3d at 759 ("On several occasions, we have found that an agent's experience qualifies him or her to testify as an expert regarding drug trafficking counter-surveillance.") And courts in other circuits have specifically held that forensic interviewers are qualified to testify about the subjects of Cook's proposed testimony because of their experience interviewing victims of child sexual assault. *United States v. Doak*, 47 F.4th 1340, 1359 (11th Cir. 2022) (holding that a forensic interviewer's "firsthand experience equipped her to identify trends in how children process abuse and disclose it"); *United States v. Halamek*, 5 F.4th 1081, 1088 (9th Cir. 2021) (holding that a forensic interviewer's experience interviewing victims of child sexual assault qualified her to testify about the behavior of abusers); *United States v. Young*, 623 Fed. Appx. 863, 865 (9th Cir. 2015) (holding that a forensic interviewer who had interviewed more

than 1,800 children had specialized knowledge about the processes of victimization and disclosure); *United States v. Ewton*, No. CR-21-252, 2022 U.S. Dist. LEXIS 109325, at *2–3 (E.D. Okla. June 21, 2022).

Cook's extensive practical experience as a forensic interviewer and victim advocate, in addition to her education and training, qualifies her to testify about these subjects. She is not unqualified merely because her experience does not include the application of the scientific method to these subjects.

### 3.2. Reliability

If a court concludes that an expert is sufficiently qualified to testify as an expert, the court must then determine whether that expert's methodology is reliable. Fed. R. Evid. 702; *Gopalratnam*, 877 F.3d at 779. The test of reliability is flexible, because there are many different kinds of experts and expertise. *Gopalratnam*, 877 F.3d at 780 (7th Cir. 2017); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Kornely argues that Cook cannot testify about the alleged victims' disclosures of abuse or about Kornely's behavioral patterns in this case, because there is no reliable method for determining the accuracy of a victim's disclosure and because she has not interviewed either the victims or Kornely and is not qualified to do so. (ECF No. 34, at 17–18.) The government has clarified that it does not intend to ask Cook about Kornely, the alleged victims, or any other witnesses in this case. (ECF No. 38, at 5.) The government has not provided Cook with any information about the facts of this case. (ECF No. 38, at 5.) The government will ask Cook only to educate the jury about general principles.

Kornely also argues that Cook's testimony is not reliable because it is not based on the methods and procedures of science. (ECF No. 34, at 16.) He contends that her opinions are not testable, do not have a rate of error, and have no peer-reviewed basis. (ECF No. 34, at 16–17.) As with his arguments about Cook's qualifications, Kornely's arguments are based on the mistaken contention that an expert's testimony must be scientific. "[E]xperience alone" or "experience in conjunction with other knowledge, skill, training or education" may "provide sufficient foundation for expert testimony." Fed. R. Evid. 702, advisory committee's note to 2000 amendment; *see also United States v. Shamsud-Din*, No. 10-CR-927, 2012 U.S. Dist. LEXIS 11452, at *14–16 (N.D. Ill. Jan. 31, 2012) (holding that a pediatrician's expert testimony about sex trafficking was sufficiently reliable where it was based on personal interviews with victims). Moreover, the indicators of reliability that Kornely points to—peer-review, rate of error, and testability—are factors that courts may consider but not requirements, and they are more helpful in evaluating the reliability of scientific studies than descriptive testimony based on experience. *See Lawson v. Trowbridge*, 153 F.3d 368, 375 (7th Cir. 1998).

Where experts are qualified based on their experience and training to testify about the behaviors of child sex abuse victims and the behaviors of their abusers, courts frequently hold that such testimony may be admitted. *Doak*, 47 F.4th at 1359 (11th Cir. 2022); *Halamek*, 5 F.4th at 1088; *United States v. Batton*, 602 F.3d 1191, 1200–1202 (10th Cir. 2010); *United States v. Anagal*, No. 24-3099, 2026 U.S. App. LEXIS 11435, at *2–3 (9th Cir. April 22, 2026); *United States v. Miller*, No. 20-CR-

58, 2022 U.S. Dist. LEXIS 15945, at *17–19 (E.D. Tenn. Jan. 28, 2022); *United States v. Maxwell*, No. 20-CR-330, 2021 U.S. Dist. LEXIS 220399, at *6–11 (S.D.N.Y. Nov. 11, 2021); *but see United States v. Raymond*, 700 F. Supp. 2d 142, 147–149 (D. Me. 2010) (excluding an FBI agent's testimony about grooming because the government failed to show that his opinions were based on reliable methods).

The government, as the proponent of Cook's expert testimony, bears the burden of proving that her testimony is admissible by a preponderance of the evidence. *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019) (citing *Lewis*, 561 F.3d at 705). With the exception of Cook's proposed testimony regarding the accuracy rates of sexual abuse allegations, the government has made a sufficient showing that Cook's testimony will be based on reliable principles and methods. During the *Daubert* hearing, Cook testified that she has conducted over 1,000 interviews of victims of child sexual abuse. Additionally, Cook's testimony demonstrated considerable familiarity with the academic literature on the topics of her proposed trial testimony. For each topic of Cook's proposed testimony, Cook explained how her experience led her to her opinion on that topic. And Cook further explained, often by citing specific scientific studies, that her opinions on each topic are consistent with the academic literature.

However, the government has not met its burden with respect to Cook's conclusions about the accuracy rates of child sexual abuse allegations. Cook testified that out of all the child sexual abuse cases in which she has worked on, only one or two allegations of abuse have been proven to be inaccurate. When asked about her

methods of verifying such allegations, Cook testified that in certain cases they have "ground-truth" such as corroborating witnesses and physical evidence that can assist in determining accuracy. But she did not specify her method further by explaining, for instance, how such evidence is weighed or at what point an allegation is deemed to be inaccurate. Cook also testified that there is a consensus in the academic literature that between 1% and 6% of child sexual abuse allegations are unsubstantiated. But Cook stated that it is incredibly difficult to determine the accuracy of such allegations. In fact, Cook testified that there is no standardized method in the academic literature for making such a determination and that the methods used vary widely. Cook did not describe what those methods are. Cook's testimony failed to demonstrate that her experience or the academic literature provides a sufficiently reliable basis for her opinions on the accuracy of sexual abuse allegations.

**3.3. Relevance**

Expert testimony must also "help the trier of fact to understand the evidence or to determine a fact in issue." Expert testimony is helpful "if it concerns a matter beyond the understanding of the average person." *Davis v. Duran*, 276 F.R.D. 227, 231 (N.D. Ill. 2011); *see also United States v. Mansoori*, 304 F.3d 635 (7th Cir. 2002) (holding that expert testimony about the operations of drug traffickers and street gangs was helpful because the average juror was unlikely to be familiar with those

matters). The government proposes to have Cook testify about several topics relating to the behavior of victims and perpetrators of child sexual abuse.

#### 3.3.1. Grooming

The government intends to ask Cook to explain "what 'grooming' is" and "its various stages." Federal courts have allowed experts to testify about the grooming methods of child sexual abusers. *United States v. Romero*, 189 F.3d 576, 584–585 (7th Cir. 1999); *United States v. Hitt*, 473 F.3d 146, 158 (5th Cir. 2006); *Batton*, 602 F.3d at 1200–1202. In the past, this kind of testimony was helpful in dispelling jurors of the common "misconception[] that the only people who commit sexual offenses are strangers, not trusted family members or friends." *Batton*, 602 F.3d at 1200. But it is now common knowledge that child sexual abusers are often familiar to their victims. Expert testimony is not needed to inform lay jurors of that fact.

However, Cook's testimony regarding what she terms grooming is helpful because it will help the jury understand the methods that child sex abusers routinely employ in identifying and seducing victims. For example, Cook explained that sex abusers will routinely engage in conduct that will afford them access to victims of their preferred demographic. An abuser will then generally strive to identify those individuals who are particularly vulnerable to abuse. Factors may include lower intellectual functioning or familial instability. The would-be abuser may then engage in various means of boundary testing such as asking the child to keep a secret or wrestling or tickling that may result in incidental sexual contact to assess how the child responds. An abuser may attempt to isolate the child or win the child's favor

with gifts. Cook explained that not all conduct that falls within the broad category of grooming is reflective of child sex abuse. Indeed, certain grooming behaviors overlap with innocent or even positive conduct (*e.g.*, an adult mentoring a disadvantaged youth). Thus, it is the combination of behaviors and particularly the presence of behaviors that are unlikely to have an innocent explanation that tend to suggest grooming. Many of the behaviors that Cook terms grooming were allegedly exhibited by Kornely, and therefore this evidence is relevant.

#### 3.3.2. Victim disclosure of abuse

The government intends to ask Cook about "the dynamics of disclosure and why there might be a delay between a crime against a child/teenager and reporting of the same." (ECF No. 38-1, at 4.)

To obtain a conviction under 18 U.S.C. § 2423(a) the government need not prove that a sexual assault occurred. Conversely, proof of a sexual assault would not necessarily prove Kornely's guilt of the charged offenses. However, the government does need to prove that Kornely transported a minor "with the intent of engaging in sexual activity for which any person could be charged with a criminal offense." Whether such sexual activity actually occurred is highly probative of whether Kornely intended for it to occur.

Based on its allegations, the government is likely to argue that Kornely did, in fact, sexually assault B.D. and J.R. Accordingly, Kornely is likely to challenge those contentions, and he may do so by pointing to the delayed disclosure of the alleged victims.

Expert testimony on this topic will help jurors to understand whether victims delay disclosure of their abuse, knowledge which is likely beyond the ken of lay jurors. Indeed, some jurors may assume that all or most victims promptly report their abuse. Cook's testimony at the *Daubert* hearing indicated that this may not be true. Cook explained that victims of child sexual abuse frequently delay disclosing abuse, and that the disclosure process is affected by a variety of factors including age, gender, barriers to disclosure, and the closeness of the relationship between the victim and abuser. Lay jurors are unlikely to have this background knowledge which will aid them in assessing the veracity of the victims' accounts of abuse. This conclusion is consistent with the decisions of several other courts concluding that similar testimony may be helpful to the jury. *United States v. Parson*, 84 F.4th 930, 934 (10th Cir. 2023) (holding that a district court acted reasonably in concluding that an expert's testimony on delayed reporting of sexual abuse was helpful to the jury); *United States v. Johnson*, 860 F.3d 1133, 1140–41 (8th Cir. 2017) ("[E]xpert testimony about how individuals generally react to sexual abuse—such as not reporting the abuse and not attempting to escape from the abuser—helps jurors evaluate the alleged victim's behavior"); *Young*, 623 Fed. Appx. at 865–866 (concluding that an expert's testimony about the commonality of delayed and piecemeal disclosure of sexual abuse was helpful to the jury where the defendant challenged the victims' credibility based on their delayed and incomplete reports of abuse).

The alleged victims' delayed reporting is a central issue in this action. Consequently, expert testimony on this subject is relevant.

#### 3.3.3. Memories of abuse

The government intends to ask Cook about "the nature of memories regarding" child sexual abuse and "why victims of child/teenage sexual abuse might have difficulty recalling specific details associated with their abuse." (ECF No. 38-1, at 3–4.) Cook's experience interviewing child victims of sexual abuse likely qualifies her to testify about aspects of how *children* recall abuse. But the present action involves adults recalling abuse that occurred when they were teenagers. The government has not shown that Cook is qualified to testify as an expert about how adults recall childhood abuse. She has not, for example, interviewed hundreds of adults who reported having suffered sexual abuse as children. Insofar as Cook or the government may be intending to rely on the inference that characteristics of childhood memory apply when adults are asked to recall events that occurred as children, the government has failed to demonstrate that such an inference is supported by science. In short, the opinion that Cook is qualified to offer regarding how children recall memories is not relevant because the alleged victims are adults and the opinion that is relevant regarding how adults recall memories of events that occurred when they were children is one that Cook is not qualified to offer.

#### 3.3.4. Voluntariness of behavior

The government intends to ask Cook "why a victim might make contemporaneous communications with their abuser that suggest the victim's behavior is 'voluntary,' when it is not." If Cook intends to testify about victim communications that suggest voluntary engagement in sexual activity, that

testimony would be irrelevant. "Minors lack the capacity to consent, and so sexual contact with a minor is always 'without consent.'" *United States v. Rogers*, 587 F.3d 816, 820 (7th Cir. 2009) (citing *Doe v. Smith*, 470 F.3d 331, 345 (7th Cir. 2006)). Since sexual contact with a minor can never be voluntary, expert testimony supporting that fact is not necessary.

However, Cook's testimony at the *Daubert* hearing suggested that she does not seek to testify as to consent or voluntariness in the legal sense but rather how a victim may seemingly acquiesce to abuse. For instance, Cook explained that abusers will often obtain their victims' participation by improving their environment in other ways. Cook also explained that abusers often manipulate and confuse victims to such an extent that victims do not recognize the abuse that is being done to them as abuse. Testimony about these topics overlaps with Cook's proposed testimony about grooming and delayed disclosure and is relevant and helpful to a jury.

**3.3.5. Appearance of abusers to others**

The government intends to ask Cook "how abusers can frequently appear normal and law-abiding to their family and community while engaging in their crimes." Similarly, the government intends to ask Cook "how and why child/teenage sexual abusers conceal their crimes."

Most people no longer believe that every child abuser is a "dirty old man in a wrinkled raincoat who snatches children off the street as they wait for the school bus." *Romero*, 189 F.3d at 584 (7th Cir. 1999) (internal quotation marks omitted). "Today's news unfortunately is replete with stories of child sexual abuse involving

priests and pastors, teachers and doctors, family members, and, in fact, almost every kind of trusted and seemingly trustworthy person." *Raymond*, 700 F. Supp. 2d at 151. Lay jurors do not require expert testimony to know that child sexual abusers may appear normal to their family or the community. Cook will not be permitted to testify on this subject.

As for concealment, it is quite obvious why perpetrators of child sexual abuse want to conceal their crimes; however, lay jurors are not likely to be familiar with the methods that child sexual abusers use to conceal those crimes. For instance, Cook testified that child sexual abusers frequently choose victims that are less likely to disclose abuse and use particular means and methods to identify such persons. Cook's testimony about such methods could be helpful to the jury and is relevant to this case.

**3.3.6. Identification of victims and location for abuse**

The government intends to ask Cook "how and why child/teenage sexual abusers identify and 'test' potential victims" and "how and why child/teenage sexual abusers use specific physical locations to engage in their abuse." This information overlaps with what Cook identified as grooming and could be helpful to a jury.

Cook testified that abusers test victims through a variety of methods including inviting a child to their residence and observing whether parents attempt to check in with their child during the visit or quickly touching an intimate part of a child and observing how the child reacts. A lay juror is unlikely to know about these or other methods that abusers use to identify and test victims. This testimony is relevant

because Kornely has allegedly engaged in behaviors that, by Cook's description, are used to test potential victims.

A lay juror is equally unlikely to know how sexual abusers choose locations to conduct their abuse. An element of the first two counts is Kornely's intent in transporting B.D. and J.R. to Chicago. Expert testimony regarding how child sex abusers select locations for their abuse will aid the jury in assessing Kornely's intent.

**3.3.7. Predation patterns**

The government intends to ask Cook "how and why child/teenage sexual abusers frequently follow similar predation patterns against multiple victims." The government has proffered evidence that Kornely engaged in similar conduct over the span of many years. As such, Cook's proffered testimony is relevant. It is also helpful to the jury insofar as laypersons may see child sex assaults as crimes of opportunity rather than planned offenses.

**3.3.8. Accuracy of accusations**

The government intends to ask Cook about "the relative accuracy rates of child/teenage sexual abuse allegations." This information would not be helpful to the jury nor relevant. An expert testifying that some percentage of reports of child sex abuse are accurate would have the effective of an expert opining that there is that percent chance that these alleged victims are telling the truth. Such opinion testimony is clearly impermissible. *United States v. Magnan*, 756 Fed. Appx. 807, 814 (10th Cir. 2018) (concluding that "an expert placing a mathematical estimate on the rate of false accusations by victims" is "a form of impermissible credibility-bolstering

testimony"); *United States v. Mullins*, 69 M.J. 113, 116 (C.A.A.F. 2010); *Snowden v. Singletary*, 135 F.3d 732, 738 (11th Cir. 1998).

**4. Conclusion**

Cook is sufficiently qualified by her experience, education, and training to testify about behavioral patterns of sexual abusers and victim disclosure of sexual abuse. With the exception of Cook's testimony regarding the accuracy rates of child sexual abuse allegations, the government has sufficiently established the reliability of Cook's testimony. Most of the testimony that the government intends to elicit from Cook would be helpful to the jury; however, the proffered testimony regarding the recall of child victims of sexual abuse, the appearance of child sexual abusers to their family and community, and the accuracy rates of allegations of abuse would not assist the jury.

**IT IS THEREFORE ORDERED** that the defendant's motion to exclude the testimony of Lynn Cook is GRANTED in part and DENIED in part as set forth in this order.

Dated at Green Bay, Wisconsin this 16th day of September, 2026.

*s/ Byron B. Conway*
BYRON B. CONWAY
U.S. District Judge